790 N.E.2d 155 (2003)
In re K.J.A., a Child Alleged to be a Delinquent Child.
Indiana Family and Social Services Administration, Division of Disabled Aging and Rehabilitative Services, an agency of the State of Indiana, Appellant-Petitioner,
v.
Henry County Office of Family and Children, Appellee-Intervenor.
No. 33A01-0205-JV-191.
Court of Appeals of Indiana.
June 19, 2003.
*156 Steve Carter, Attorney General of Indiana, Janet L. Parsanko, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.
Mark C. Stamper, New Castle, IN, Attorney for Appellee.

OPINION
MATTINGLY-MAY, Judge.
The Indiana Family and Social Services Administration ("FSSA"), Division of Disabled Aging and Rehabilitative Services ("the Division"), appeals the trial court's denial of its motion to correct error. The Division raises one issue on appeal, which we restate as whether the trial court erred in denying the Division's motion to correct error because the court erroneously required the Division to pay the costs of K.J.A.'s placement. We reverse and remand.

FACTS AND PROCEDURAL HISTORY
In the summer of 1999, twelve-year old K.J.A. was referred to the Division for an evaluation to determine whether she was eligible to receive services under the Division's Bureau of Developmental Disabilities Services ("the Bureau"). On July 22, 1999, K.J.A.'s mother filled out a Division referral application.
On August 29, 2000, while the Division application was pending, police arrested K.J.A., who was then thirteen-years old. The State filed a petition for a juvenile detention hearing. The trial court appointed counsel to represent K.J.A. and held a detention hearing. Thereafter, the court determined it was in K.J.A.'s best interests not to return to her parents' home at that time and ordered she be detained in the Henry County Youth Center's residential, non-secure section. The court ordered the costs of detention be paid by Henry County's Office of Family and Children ("HCOFC") pursuant to Ind. Code § "XX-XX-X-X et seq., both prior to and subsequent to the date of this Order." (Appellant's App. at 9.)
On September 5, 2000, the State filed a delinquency petition alleging that K.J.A. had been delinquent by habitually disobeying her parents[1] and by leaving home without her parents' permission.[2] K.J.A. admitted at her initial hearing that she was habitually disobedient of her parents. At the State's request, the trial court dismissed Count II, regarding K.J.A. leaving home without permission. The court found K.J.A. to be a delinquent child and scheduled a dispositional hearing.
On November 14, 2000, the Division determined that K.J.A. was not eligible for services through the Bureau because she did not have "substantial limitations in three (3) or more life areas" and her impairments were "not due to developmental delays." (Id. at 64.) (Capitalization removed.) *157 On November 16, 2000, the trial court held K.J.A.'s dispositional hearing and determined that she should stay at the Henry County Youth Center while the denial of services by the Division was pending on appeal.
On December 18, 2000, the probation department filed a supplemental report regarding K.J.A. that stated:
It is the recommendation of the Probation Department that [K.J.A.] be placed at the Indiana Developmental Training Center ["IDTC"], ... Lafayette, IN.... The Probation Department will continue to pursue an appeal of the denial of services by the [Division] ..., but the appeal process will be lengthy and the outcome uncertain. It is in the best interest of [K.J.A.] that she be placed at the IDTC where she can receive treatment for her many psychological, behavioral and educational issues. If an appeal is successful and services are available at a later date from [the Division], a modification of disposition could be filed.
(Id. at 27-28.) On December 21, 2000, the trial court conducted another dispositional hearing and ordered K.J.A. placed in the IDTC in Lafayette pending the appeal of her Division application. In that order, the court provided "the costs associated with placement shall be paid from the Family & Children's Fund in association with the local Division of Family & Children pursuant to I.C. XX-XX-X-X et seq., both prior to and subsequent to the date of this Order." (Id. at 30.)
On January 31, 2001, the Administrative Law Judge ("ALJ") of the Division heard K.J.A.'s appeal of the denial of her application for services from the Bureau as a developmentally disabled individual. The ALJ found that K.J.A. met five of the eligibility criteria and the Bureau's earlier decision to deny services to K.J.A. was "not affirmed." (Id. at 69.) On February 23, 2001, the Division "adopt[ed]" the ALJ's "findings of fact and the decision." (Id. at 51.)
On July 19, 2001, the trial court reviewed K.J.A.'s case and ordered her to continue her placement at IDTC. On December 21, 2001, the court conducted another review of K.J.A.'s case and again ordered her to remain at IDTC. However, this time the court ordered "the costs associated with the ... placement at the [IDTC] shall be paid by the [Division] ... pursuant to the attached determination of eligibility of the [ALJ] as approved February 23, 2001, both prior to and subsequent to the date of this Order." (Id. at 32-33.)
The Division filed a motion to correct error in which it argued the juvenile court did not have the authority to order the Division to pay for K.J.A.'s placement as a juvenile delinquent. The HCOFC filed a motion in opposition to the State's motion to correct error in which HCOFC argued the Division was required by law to pay for K.J.A.'s placement because it had not appealed the ALJ's determination of K.J.A.'s eligibility for services. After a hearing, the trial court denied the Division's motion to correct error. The Division appeals.

DISCUSSION AND DECISION
A trial court has discretion to determine whether it will grant or deny a motion to correct error. Volunteers of America v. Premier Auto Acceptance Corp., 755 N.E.2d 656, 658 (Ind.Ct.App. 2001), trans. denied. We reverse the trial court's decision only for an abuse of that discretion. Id. A trial court abused its discretion if its decision was against the logic and effect of the facts and circumstances before the court or if the court misapplied the law. Id.
*158 The Division argues that the trial court abused its discretion when denying its motion to correct error because the court did not have the authority to order the Division to pay for K.J.A.'s placement in IDTC pursuant to a delinquency proceeding. The Division claims the trial court's order violates Ind.Code § 31-40-1-1.[3] We review the construction of statutes de novo, giving no deference to the trial court's interpretation. Hochstedler v. St. Joseph County Solid Waste Management Dist., 770 N.E.2d 910, 914 (Ind.Ct.App. 2002), trans. denied. Our goal is to ascertain the intent of the legislature by giving effect to the language that was used. Id. "Accordingly, if the language of a statute is clear and unambiguous, it is not subject to judicial interpretation." Id.
On two previous occasions, we have held that a juvenile court did not have statutory authority to order a state agency to pay for the services provided to a delinquent child or a child in need of services. See In re E.I., 653 N.E.2d 503, 511-12 (Ind.Ct. App.1995) (holding juvenile court could not order the Indiana Division of Mental Health, the Indiana Family and Social Services Administration, Indianapolis Public Schools and Department of Education to pay for services ordered for a CHINS because Ind.Code § 31-6-4-18(a) placed that burden on the county); In re Garrett, 631 N.E.2d 11, 13 (Ind.Ct.App.1994) (holding juvenile court could not order the Department of Mental Health to pay for mental health treatment of a juvenile delinquent because Ind.Code § 31-6-4-18(a) required the county to pay for services for a juvenile delinquent), trans. denied.
Those decisions were both made when the controlling statute was XX-X-X-XX(a), which provided: "The cost of any services ordered by the juvenile court for any child, or the child's parent, guardian, or custodian, and the cost of returning a child under IC 31-6-10 shall be paid by the county. The county council shall provide sufficient funds to meet the court's requirements." 1995 Ind. Acts 270, § 1. The legislature subsequently amended the statute, with the new language becoming effective January 1, 2000. See 1999 Ind. Acts 273, § 119.
Now, the controlling statute provides:
(a) The county shall pay from the county family and children's fund the cost of:
(1) any services ordered by the juvenile court for any child or the child's parent, guardian, or custodian, other than secure detention; and
(2) returning a child under IC 31-37-23.
(b) The county fiscal body shall provide sufficient money to meet the court's requirements.
Ind.Code § 31-40-1-2. The amendment changed the requirements by 1) specifying that services were to be paid from the county's family and children's fund, and 2) excluding "secure detention"[4] from the *159 services that the county could pay for with money from the county's family and children's fund.
K.J.A. was placed in the IDTC in Lafayette, Indiana. The record does not indicate whether that facility is secured or unsecured. If the facility is unsecured, then Ind.Code § 31-40-1-2 requires the county to pay for that service from the county's family and children's fund. See Garrett, 631 N.E.2d at 13 (holding previous version of the statute required the county to pay for the services and prohibited the juvenile court from requiring a state agency to pay for services). Accordingly, the juvenile court did not have the authority to order the Division to pay for K.J.A.'s placement. See id.
If the facility is secured, then the county still has to pay for the services. Ind.Code § 31-31-8-3, which discusses provision of facilities, staff, budget and expenses for juvenile detention and shelter care facilities, provides: "(d) The county shall pay all expenses. The expenses for the juvenile detention facility shall be paid from the county general fund. Payment of the expenses for the juvenile detention facility may not be paid from the county family and children's fund established by IC XX-XX-X-X."[5] Consequently, if IDTC is a secured facility then the county should pay for K.J.A.'s placement from the county's general fund. The same rationale that prohibited the juvenile court from assigning the costs of a juvenile's placement to a state agency in E.I. and Garrett prohibits the juvenile court from assigning to the Division the costs of placing K.J.A., who was adjudicated a delinquent, in the IDTC. See E.I. 653 N.E.2d at 511-12 ("The mandatory `shall' employed in the statute limits the court's discretion and does not permit allocation of responsibility for payment of costs associated with CHINS services to any source other than the county council.").
Nevertheless, the HCOFC claims,[6] and the trial court found, that the Division *160 became responsible for the services provided to K.J.A. due to the Division's approval of the ALJ's determination that K.J.A. qualified for services from the Bureau. The ALJ's order, after setting out the procedural posture of the case and listing the ALJ's findings of fact, provides:
The Administrative Law Judge, based on the facts established and proven, concludes that [K.J.A.] does meet all 5 eligibility requirements for [the Bureau], in that 1) She has a mental impairment, that 2) originated prior to age 22, that 3) is likely to continue indefinitely, that 4) reflects the need for a combination and sequence of special, interdisciplinary or generic care treatment or other services that are of lifelong or extended duration and are individually planned and coordinated, and 5) she has substantial limitations in three life areas: learning, self-direction and capacity for independent living.
Therefore, the decision of the [Bureau], Indiana [Division], is not affirmed.
(Appellant's App. at 53.)
That order indicates only that K.J.A. qualifies for services under the Bureau. It does not indicate that the Bureau would pay for K.J.A.'s placement at IDTC. In fact, multiple sections of Ind.Code Art. 12-11, which discusses services for individuals with disabilities, lead us to believe that a finding that K.J.A. qualified for services is insufficient to require the Bureau to pay for services for K.J.A.
For example, Ind.Code § 12-11-1.1-1 provides, in pertinent part:
(c) Services for developmentally disabled individuals must be services that meet the following conditions:
* * * * * *
(6) Are provided in conformity with a service plan developed under IC 12-11-2.1-2.
In addition, Ind.Code § 12-11-2.1-3 states: "All services provided to an individual must be provided under the developmentally disabled individual's individual service plan." Consequently, K.J.A. did not only have to qualify for services to receive services from the Bureau; an individual service plan had to be developed before she could receive services.
Moreover, once she had an individual service plan, there was no guarantee that the Bureau would pay for any services she might receive. Ind.Code § 12-11-1.1-2, which discusses payment for services coordinated by the Bureau, provides:
(a) Except as specified by the terms of the Medicaid program:
(1) an individual who receives services under this chapter; and
(2) the parents of the individual, if the individual is less than eighteen (18) years of age;
are liable for the cost of services and supports.
(b) The bureau shall make every effort to assure that individualized service plans developed for developmentally disabled individuals maximize the amount of Medicaid funding available to meet the needs of the individual.
(c) The bureau may provide reimbursement for services identified in an individual's individual service plan that are *161 not eligible for Medicaid reimbursement and for which the individual does not have the resources to pay.
(Emphasis added.) In addition, Ind.Code § 12-11-1.1-1 states: "(b) The bureau shall plan, coordinate, and administer the provision of individualized, integrated community based services for developmentally disabled individuals and their families, within the limits of available resources...." (Emphasis added.) Consequently, while the Bureau would attempt to acquire Medicaid funding for services for K.J.A., the financial responsibility for any services ultimately would rest with K.J.A. and her family. The Bureau may provide finding if the resources are available.
In summary, not only did the juvenile statutes prohibit the court from requiring anyone aside from the county to pay for services provided for K.J.A., the statutes that establish the Bureau clearly prohibit the Division from being held responsible for K.J.A.'s placement at IDTC. The trial court abused its discretion in failing to grant the Division's motion to correct error.[7] Consequently, we reverse the trial court's order requiring the Division to pay for K.J.A.'s placement at IDTC and we remand for further proceedings consistent with this opinion.[8]
Reversed and remanded.
MATHIAS, J., concurs.
KIRSCH, J., concurs with separate opinion.
KIRSCH, Judge, concurring.
I fully, albeit reluctantly, concur.
The procedural history of this case would make Joseph Heller, the author of Catch 22, proud. In Heller's book, the protagonist was a war time pilot endeavoring to fly a sufficient number of missions so that he could return home. Each time *162 he reached the requisite number, however, the powers that be would raise the number with the resulting catch being that no pilot ever reached the magic number,
Here, the Bureau of Developmental Disabilities (BDDS) of the Division of Disability, Aging and Rehabilitative Services (DDARS) of the Indiana Family and Social Services Administration (FSSA) determined that K.J.A. was not eligible for services. Recognizing what the BDDSthe bureau of the division of the administration charged with helping people with severe developmental disabilitiesdid not, namely that K.J.A. was severely developmentally challenged, the trial court ordered K.J.A. placed at the Indiana Developmental Training Center where her "many psychological, behavioral and educational issues" could be treated and ordered payment by the county's family and children's fund pending an appeal of the denial of services by the BDDS to the DDARS.
The DDARS reversed the BDDS decision that K.J.A. was not eligible for services, found that she met five eligibility criteria and was, indeed, eligible for services. Relying upon the finding that K.J.A. was eligible for servicesservices which K.J.A. was already receiving at the Training Center, the trial court ordered DDARS to pay for the services for which it found K.J.A. eligible.
Now comes the catch: Being "eligible for services" does not mean that the person will actually receive the services for which she is eligible. Rather, that person cannot receive services until an individual service plan is developed. Here, ten months elapsed from the time that K.J.A. was determined eligible for services to the trial court's review hearing. There is no indication that the BDDS, the DDARS or the FSSA ever began to develop the individual service plan during this time or subsequently.
I have always found the triumph of procedure over substance galling. It is especially so where the procedure is used to deny services to people who desperately need them by an agency which exists to help those people acquire those services. K.J.A. suffers from severe, multiple developmental disabilitiesa fact which is obvious to all except the BDDS. The BDDS found that K.J.A. was not eligible for services necessitating an appeal. When that decision was reversed, the BDDS failed for ten months to develop an individual service plan. Only then did the trial court take action. While I agree that the court exceeded it authority, I join my colleagues in encouraging the BDDS, the DDARS and the FSSA to move with all dispatch to develop the necessary individual service plan for K.J.A.
NOTES
[1] Ind.Code § 31-37-2-4.
[2] Ind.Code § 31-37-2-2.
[3] Ind.Code § 31-40-1-1 explains that Article 40 of Title 31 of the Indiana Code "applies to a financial burden sustained by a county as the result of costs paid by the county under section 2 of this chapter, including costs resulting from the institutional placement of a child adjudicated a delinquent child or a child in need of services." Section two of that chapter indicates that the county will be responsible for certain costs, and we will discuss that section in more detail below. See Ind.Code § 31-40-1-2.
[4] The juvenile code does not define "secure detention." We presume that term refers to "detaining" a child in a "secure facility." A "secure facility," as defined by the juvenile code, is "a place of residence, other than a shelter care facility, that prohibits the departure of a child." Ind.Code § 31-9-2-114. A "secure private facility" is defined for the juvenile code, in pertinent part, as "(1) A facility that is licensed under IC 12-17-4 and IC 12-17.4 to operate as a secure private facility." Ind.Code § 31-9-2-115.

In addition, the juvenile code defines a juvenile detention facility as a secure facility that either "is only used for the lawful custody and treatment of juveniles and meets state standards and licensing requirements as provided in department of correction rule 210 IAC 6" or "is located on the same grounds or in the same building as an adult jail or lockup" and meets four specific criteria. Ind. Code § 31-31-8-2.
[5] Prior to the passage of P.L. 273-1999, subsection (d) of Ind.Code § 31-31-8-3 simply provided "The county shall pay all expenses." See 1999 Ind. Acts 273, § 96. The legislature amended this statute to clarify what funds the county should use to pay for juvenile detention facilities in the same act that amended Ind.Code § 31-40-1-2 to indicate that the county's family and children's fund would not pay for secured detention. See id. §§ 96, 119.
[6] The HCOFC also claims that the juvenile court had authority to order the Division to pay because it could have referred K.J.A. to the State for assumption of care through commitment proceedings as provided in Ind.Code § 31-34-19-3. While that section permits the juvenile court to initiate civil proceedings to commit a mentally ill child under Ind.Code Art. 12-26, the next section requires a county office of family and children to continue paying for the child's services pending the outcome of a proceeding under Ind.Code Art. 12-26. Ind.Code § 31-34-19-4. Moreover, Ind.Code § 31-34-19-5 prohibits the court from releasing the county office from obligation to the child until "a parent, guardian, or other responsible person approved by the court assumes the obligation." Consequently, Ind.Code § 31-34-19-3 will not result in the State taking over payments from services for a child until after a proceeding under Ind. Code Art. 12-26 and then only if the State "assumes the obligation." Id.

In addition, the HCOFC argues that the trial court had authority to order the Division to pay under Ind.Code § 31-37-19-1 because the court had "equitable discretion to fashion a dispositional order that meets the goals and policy of its juvenile court jurisdiction, but does not clearly fit within one of the statutory alternatives." (Appellee's Br. at 5.) While we agree that the trial court had discretion to fashion a dispositional order that was in K.J.A.'s best interests, and therefore had the authority to place K.J.A. in the IDTC, we decline to hold that the court's discretion extends to ordering a third party to pay for whatever services were to be provided to a delinquent when other sections of the juvenile code clearly place that burden on the county.
[7] Because the A.L.J.'s order indicated only that K.J.A. was eligible for services, not that the Bureau would pay for any services provided to her, the Division's failure to appeal that administrative ruling did not waive the Division's current argument that the Bureau cannot be forced to pay for K.J.A.'s placement in the IDTC.

In addition, if we accept as true the HCOFC's allegation, supported by affidavits and attached evidence, that the HCOFC asked at the review of the A.L.J.'s determination for the Division to assume financial obligation for K.J.A., the Division's approval of the A.L.J.'s finding that K.J.A. qualified for services was not tantamount to the Division finding that the Bureau would pay for any services for which K.J.A. qualified. As we said above, the Division approved the A.L.J.'s finding, and that finding provided only that K.J.A. was eligible for services.
Moreover, accepting as true the HCOFC's allegation that a representative of the Division said that "IDTC was the [Division]'s recommendation also" for K.J.A., (Appellant's App. at 70), such a recommendation was not equivalent to the representative saying the Bureau would assume responsibility to pay for K.J.A.'s placement at IDTC. The statutes creating the Bureau create no such responsibility.
HCOFC's belief that the Division would assume financial responsibility for K.J.A.'s placement upon the determination that she was eligible for services appears to be based more on a misunderstanding of the administrative hoops that a party must pass through before receiving services from the Bureau and a misunderstanding of the Bureau's lack of responsibility to pay for services it coordinates, than on any action taken by the Bureau or the Division. Accordingly, the trial court erred when it found the Division's arguments were barred by waiver or laches.
[8] Because the trial court may not order the Division to pay for K.J.A.'s services, we encourage the HCOFC to avail itself of any administrative procedures that may be available to prompt the Bureau to create the individualized service plan required for K.J.A. to receive service coordination and, then, to assist the HCOFC in determining whether any portion of K.J.A.'s placement at the IDTC can be covered by Medicaid.